**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| NATALIE CUNHA, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. _____ |
| LA QUINTA HOLDINGS INC., JAMES R. ABRAHAMSON, GLENN ALBA, SCOTT BERGREN, ALAN J. BOWERS, HENRY G. CISNEROS, GIOVANNI CUTAIA, BRIAN KIM, MITESH B. SHAH, GARY M. SUMERS, WHG BB SUB, INC., and WYNDHAM WORLDWIDE CORPORATION, | § § § § § § § § § § | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| Defendants, | § § | **JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Natalie Cunha ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of La Quinta Holdings Inc. ("La Quinta" or the "Company") against La Quinta's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Wyndham Worldwide Corporation through its wholly-owned subsidiary WHG BB Sub, Inc. (collectively "Wyndham").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on February 22, 2018. The Proxy recommends that La Quinta shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby La Quinta, after spinning off its real estate assets, is acquired by Wyndham. The Proposed Transaction was first disclosed on January 18, 2018, when La Quinta and Wyndham announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Wyndham will acquire La Quinta, minus it's real estate assets, for $8.40 per share (the "Merger Consideration"). The deal is valued at approximately $1.95 billion and is expected to close in the second quarter of 2018.

3.      La Quinta announced on January 18, 2017 that it planned to spin-off its real estate assets. The spin-off would be accomplished by conveying La Quinta's real estate assets to CorePoint Lodging Inc. ("CorePoint"), currently a subsidiary of the Company, and then distributing CorePoint's shares to current La Quinta stockholders.

4.      Unbeknownst to stockholders, as the Company prepared the CorePoint spin-off, it was also conducting a search to sell the post-spin-off business. Despite La Quinta's own assurances of strong growth prospects, and high price targets set by market analysts, the Board agreed to sell the Company to Wyndham for just $8.40 per share.

5.      In addition, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by La Quinta management, as well as the financial analyses conducted by J.P. Morgan Securities LLC ("JPMorgan"), La Quinta's

financial advisor.

6.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to La Quinta's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to La Quinta's shareholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

**PARTIES**

7.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of La Quinta.

8.     Defendant La Quinta is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 909 Hidden Ridge, Suite 600, Irving, Texas 75038. La Quinta common stock trades on NYSE under the ticker symbol "LQ." La Quinta owns, manages or has franchised 888 hotels in 48 U.S. States, Canada, Mexico, and Central and South America.

9.     Defendant Keith A. Cline has been President and CEO of the Company since February 28, 2016 and a director of the Company since September 15, 2015. Cline served as Interim President and CEO from September 15, 2015 until February 28, 2016, and previously serve as Executive Vice President and Chief Financial Officer from January 2013 until November 2015.

10.     Defendant James R. Abrahamson has been a director of the Company since

November 2015.

11.     Defendant Glenn Alba has been a director of the Company since 2013. Alba has served on the boards of directors of certain La Quinta predecessor entities since 2006. Alba is a Managing Director in the Real Estate Group of Blackstone, which owns 29.9% of La Quinta's outstanding common stock.

12.     Defendant Scott Bergren has been a director of the Company since June 2015.

13.     Defendant Alan J. Bowers has been a director of the Company since February 2014. Bowers has served on the boards of directors of certain La Quinta predecessor entities since 2013.

14.     Defendant Henry G. Cisneros has been a director of the Company since February 2014. Cisneros has served on the boards of directors of certain La Quinta predecessor entities since 2013.

15.     Defendant Giovanni Cutaia has been a director of the Company since November 2014. Cutaia is a Senior Managing Director and Co-Head of Global Asset Management in the Real Estate Group of Blackstone, which owns 29.9% of La Quinta's outstanding common stock.

16.     Defendant Brian Kim has been a director of the Company since November 2014. Kim is a Managing director in the Real Estate Group of Blackstone, which owns 29.9% of La Quinta's outstanding common stock.

17.     Defendant Mitesh B. Shah has been Chairperson of the Board since November 2014 and a director of the Company since February 2014. Shah has served on the boards of directors of certain La Quinta predecessor entities since 2013.

18.     Defendant Gary M. Sumers has been a director of the Company since February 2014. Sumers retired as a Senior Managing Director and Chief Operating Officer in the Real

Estate Group of Blackstone in 2013, which owns 29.9% of La Quinta's outstanding common stock.

19.     Defendants Cline, Abrahamson, Alba, Bergren, Bowers, Cisneros, Cutaia, Kim, Shah and Sumers are collectively referred to herein as the "Board."

20.     Defendant Wyndham Worldwide Corporation is a Delaware corporation with its principal executive offices located at 22 Sylvan Way, Parsippany, New Jersey 07054.

21.     Defendant WHG BB Sub, Inc. is a Delaware corporation and is a wholly owned subsidiary of Wyndham.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

23.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) La Quinta maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and

engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on her own behalf and as a class action on behalf of all owners of La Quinta common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

26.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of January 17, 2018, La Quinta had approximately 116.3 million shares outstanding.

(b)     Questions of law and fact are common to the Class, including, inter alia, the following:

(i)      Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)    Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

6

(v)     whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.  Background

27.     La Quinta began in 1968 in San Antonio, Texas and went public five years later. In 2006, the Company was purchased by Blackstone and taken private. When Blackstone acquired La Quinta, the Company owned or franchised 425 hotels. By 2014, that number had grown to 834, largely from growth in franchised hotels. That year, on April 14, 2014, La Quinta once again went public. By the end of 2016, the Company had 888 hotels owned or franchised in the United States, Canada, Mexico, Honduras and Colombia, with another 248 future franchised

hotels.

28.    The Company touted its growth prospects in an investor presentation of first quarter 2017 financial results, noting its "strong free cash flow generation" and "attractive balance sheet capitalization":



29.    The market agreed with the Company's rosy outlook. In June 2017, Morgan Stanley upgraded La Quinta's stock, increasing its price target to $16.00 per share. In October 2017, Wells Fargo & Co upgraded La Quinta's stock, stating that CorePoint would have a value of $8.75 per share while the post-spin-off La Quinta would have a value of $16.00 per share. A December 22, 2017 article in Futures magazine entitled "La Quinta solo + CorePoint Lodging = $2.4 billion" calculated a fair value for CorePoint of $11.00 per share of La Quinta with a price target for the post-spin-off La Quinta of $10.00 per share.[1] And on January 17, 2018, after La

---

[1]    Cornell, Joe, "La Quinta solo + CorePoint Lodging = $2.4 billion," Futures, available at: http://admin.futuresmag.com/2017/12/22/la-quinta-solo-corepoint-lodging-24-billion.

Quinta announced the spin-off of its real estate assets, Morgan Stanley increased its price target for La Quinta to $21.00 per share.

30.     On January 18, 2018, La Quinta announced the Proposed Transaction, which will see Wyndham pay $8.40 per share in cash for the post-spin-off businesses of La Quinta. No valuation was provided for CorePoint, the spun-off real estate assets of La Quinta.

**B.  La Quinta's Officers Stand to Receive Benefits Unavailable to the Class**

31.     The Proxy acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

32.     Restricted stock awards and restricted stock units and that have been awarded to and are held by La Quinta's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through the La Quinta Holdings Inc. Project Longhorn Retention Bonus Plan, the La Quinta Holdings Inc. Retention Bonus Plan, the La Quinta Holdings Inc. Executive Severance Plan and employment agreements, will create a windfall for La Quinta's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, the executive officers of La Quinta in total stand to receive up to $23.8 million, if they are let go without "cause" or voluntarily leave for "good reason" after the Proposed Transaction closes:

| Name | Cash | Equity | Perquisites/ Benefits | Tax Reimbursements | Other | Total |
|------|------|--------|-----------------------|--------------------|-------|-------|
| Keith A. Cline | — | $3,633,837 | — | — | — | $3,633,837 |
| James H. Forson | $1,912,500 | $2,304,187 | $43,364 | — | $300,000 | $4,560,051 |
| John W. Cantele | $2,227,500 | $2,290,204 | $48,198 | — | $356,250 | $4,922,152 |
| Rajiv K. Trivedi | $2,227,500 | $3,396,592 | $48,198 | — | $235,000 | $5,907,290 |
| Mark M. Chloupek | $1,800,000 | $2,213,898 | $41,432 | $391,083 | $365,000 | $4,811,414 |

33.     The members of the Board and the executive officers stand to gain handsomely no matter their employment after the Proposed Transaction closes. In total, as demonstrated in the

following chart, the executive officers and Board members will obtain more than $17.2 million:

| | Total RSA Consideration | Total RSU Consideration | Total Stock Consideration |
|---|---|---|---|
| **Named Executive Officers** | | | |
| Keith A. Cline | $2,194,746.40 | – | $4,186,971.60 |
| James H. Forson | $650,998.00 | – | $957,516 |
| John W. Cantele | $639,173.60 | – | $945,873.60 |
| Rajiv K. Trivedi | $1,037,931.40 | – | $2,707,412.40 |
| Mark M. Chloupek | $743,346.40 | – | $1,625,635.20 |
| Other Executive Officers | $278,447.40 | – | – |
| **Directors** | | | |
| James R. Abrahamson | – | $113,832.40 | $42,495.60 |
| Glenn Alba | – | $28,413.00 | – |
| Scott Bergren | – | $116,251.40 | $47,443.20 |
| Alan J. Bowers | – | $116,251.40 | $126,319.20 |
| Henry G. Cisneros | – | $116,251.40 | $92,366.40 |
| Giovanni Cutaia | – | – | – |
| Brian Kim | – | – | – |
| Mitesh B. Shah | – | $174,938.80 | $124,479.60 |
| Gary M. Sumers | – | $116,251.40 | $57,657.60 |

Share and restricted stock unit consideration were calculated from information in Forms 4 filed by the members of the Board and named executive officers.

### C.  The Preclusive Deal Protection Devices

34.     As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

35.     By way of example, section 5.4(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting or encouraging the submission of an acquisition proposal. Section 5.4(a) further demands that the Company cease and terminate all solicitations, discussions or negotiations with any party concerning an acquisition proposal.

36.     Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be Wyndham. For example, pursuant to section

5.4(a) of the Merger Agreement, the Company must notify Wyndham of any offer, indication of interest, or request for information made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 5.4(c) requires that the Board grant Wyndham three (3) business days to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior. Wyndham is able to match the unsolicited offer because, pursuant to section 5.4(c) of the Merger Agreement, the Company must provide Wyndham with the material terms of the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

37.     In other words, the Merger Agreement gives Wyndham access to any rival bidder's information and allows Wyndham a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for La Quinta, because the Merger Agreement unfairly assures that any "auction" will favor Wyndham and allow Wyndham to piggy-back upon the due diligence of the foreclosed second bidder.

38.     In addition, pursuant to section 7.5(b) of the Merger Agreement, La Quinta must pay Wyndham a termination fee of $37 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

39.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions also

foreclose any likely alternate bidder from providing the needed market check of Wyndham's inadequate offer price.

**D.  The Materially Incomplete and Misleading Proxy**

40.     The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to La Quinta stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

41.     On February 22, 2018, Defendants filed the Proxy with the SEC. The purpose of the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, La Quinta shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

*Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

42.     The Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Proxy indicates that in connection with the rendering of JPMorgan's fairness opinion, JPMorgan reviewed "certain internal financial analyses and forecasts prepared by the management of the Company" concerning the post-spin-off business of La Quinta. Accordingly, the Proxy should have, but failed to, provide certain information in the projections that La Quinta's management provided to the Board and JPMorgan.

43.     Notably, Defendants failed to disclose the financial projections for fiscal years 2017 to 2021 for: (a) total revenue, if different from total fee revenue; (b) EBIT; (c) depreciation and amortization; (d) direct lodging expenses; (e) marketing, promotional and other advertising

expenses; (f) general and administrative; (g) interest expense; (h) taxes (or tax rate); (i) capital expenditures; (j) changes in net working capital; (k) stock-based compensation expense; (l) amortization of software service agreements; and (m) any other line items used in the calculation of unlevered free cash flow. This omitted information is necessary for La Quinta stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

44.     The Proxy also fails to disclose the projections prepared by La Quinta management and presented to the Board on October 31, 2017, as well as the projections prepared by La Quinta management and presented to the Board on January 15, 2018. These projections are necessary for stockholders to determine whether the projections relied upon by JPMorgan are optimistic or pessimistic, as well as providing a clearer picture of the Company's prospects.

### Materially Incomplete and Misleading Disclosures Concerning JPMorgan's Financial Analyses

45.     First, with respect to the *Public Trading Multiples Analysis,* the Proxy fails to disclose whether JPMorgan performed any type of benchmarking analysis for La Quinta in relation to the selected public companies.

46.     With respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the definition of "unlevered free cash flow" utilized by JPMorgan in its analysis. The Proxy also fails to disclose the individual inputs and assumptions utilized by JPMorgan to derive the discount rate range of 7.75% to 8.25%, in addition to the implied terminal EBITDA multiple range resulting from the analysis. The Proxy does not disclose how JPMorgan treated stock-based compensation expense nor how, if at all, did JPMorgan incorporate La Quinta's NOLs in the analysis.

### Materially Incomplete and Misleading Disclosures Concerning the Flawed Process

47.     The Proxy also fails to disclose material information concerning the sales process. While the Company is spinning off its real estate assets to CorePoint, the Proxy fails to disclose what analyses, if any, were done to determine the value of CorePoint and the resulting values. A "preliminary financial analysis of the CorePoint spin-off" was provided by JPMorgan to the Board on October 4, 2016, but the nature of that analysis and the analysis itself was not disclosed. Without this information, stockholders cannot properly determine the value of CorePoint compared to the Company as a whole.

48.     The Company received numerous proposals for a strategic transaction, yet the Proxy does not disclose details of these proposals. For instance, the Proxy fails to disclose the enterprise value of the proposal submitted by Bidder 2 on November 29, 2016. Three proposals were presented to JPMorgan by October 30, 2017, yet the Proxy provides no details concerning those proposals. Similarly, the Proxy does not disclose details of the proposals submitted by Bidder 2 and Wyndham on January 4, 2018, including the enterprise value of the proposal submitted by Bidder 2, as well as the proposed adjustments each bidder made to the definitions of indebtedness and transaction expenses assumed by the bidder.

49.     Throughout the sales process, the Board reviewed or received information concerning La Quinta's business that has not been disclosed in the Proxy. For example, members of La Quinta's management team reviewed "budgeted expectations" for La Quinta's businesses with the Board on January 17, 2017, yet those expectations were not disclosed in the Proxy. Similarly, on October 19, 2017, the Board discussed the impact both hurricanes Harvey and Irma were expected to have on the Company's financial results. This information was not provided in the Proxy. On October 31, 2017, the Board reviewed financial projections for the post-spin-off La Quinta business on a stand-alone basis, as well as the key assumptions underlying the

projections. Yet the Proxy does not disclose these projections or assumptions. In addition, management presented updated financial projections to the Board on January 15, 2018, but the Proxy does not disclose how the updates changed the financial projections.

50.     The Proxy also fails to disclose information about various potential conflicts of interest. For example, the Proxy does not disclose whether the Board discussed potential conflicts of interest before retaining JPMorgan as its financial advisor on January 18, 2017. In addition, the Proxy does not disclose whether any party in the sales process received financial projections from La Quinta and, if so, whether that information was provided to all parties or just certain parties. The Proxy also fails to disclose the basis for the Company to negotiate financing for the CorePoint spin-off with only JPMorgan, whether any other banks or financing sources were considered and whether the Board approved the decision to negotiation solely with JPMorgan. Finally, the Proxy does not disclose that JPMorgan Chase & Co, the ultimate parent company of JPMorgan, owns 4.6% of La Quinta's outstanding stock.

51.     The Proxy fails to provide certain financial analyses that were performed over the course of the sales process. That includes the preliminary financial valuation analyses of the post-spin-off La Quinta provided by JPMorgan at the October 31, 2017 Board meeting, as well as the preliminary financial analyses of the January 4, 2018 proposals as provided by JPMorgan at the January 8, 2018 Board meeting. In addition, the Proxy does not disclose the preliminary financial analyses provided by JPMorgan at the January 15, 2018 Board meeting.

52.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, La Quinta

stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

53.     In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

54.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

55.     Further, the Proxy indicates that on January 17, 2018, JPMorgan reviewed with the Board its financial analysis of the Merger Consideration delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to La Quinta shareholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning JPMorgan's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

56.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

### On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Defendants have filed the Proxy with the SEC with the intention of soliciting La Quinta shareholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

59.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of La Quinta, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

60.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

61.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of La Quinta shares and the financial analyses performed by JPMorgan in support of its fairness opinion; and (iii) the sales process.

62.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or

should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that JPMorgan reviewed and discussed its financial analyses with the Board during various meetings including on January 17, 2018, and further states that the Board relied upon JPMorgan's financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

63.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

64.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of La Quinta within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of La Quinta and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

66.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

68.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

69.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

70.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and her counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to La Quinta shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.     Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 8, 2018

**KENDALL LAW GROUP, PLLC**

*/s/ Joe Kendall*

OF COUNSEL:

Joe Kendall
Texas Bar No. 11260700
Jamie J. McKey
Texas Bar No. 24045262
**ROWLEY LAW PLLC**
3232 McKinney Avenue, Suite 700
Shane T. Rowley
Dallas, TX 75204
Danielle Rowland Lindahl
Telephone:  (214) 744-3000
50 Main Street, Suite 1000
Facsimile:  (214) 744-3015
White Plains, NY 10606
jkendall@kendalllawgroup.com
Tel: (914) 400-1920
jmckey@kendalllawgroup.com
Fax: (914) 301-3514